UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                Case No. 07-cr-20559

v.                                 HON. LINDA V. PARKER
                                 United States District Judge

ANTONIO M. WHITLEY,

                Defendant.

_____

**GOVERNMENT'S RESPONSE OPPOSING DEFENDANT'S
AMENDED MOTION FOR COMPASSIONATE RELEASE**

_____

    The defendant, Antonio M. Whitley, a drug dealer and six-time felon, is currently serving a sentence for possession with intent to distribute cocaine. Following a traffic stop on Whitley's vehicle, police found over 240 grams of cocaine hidden inside the tail light cavity. Whitley was on probation at the time for another drug trafficking offense. Due to Whitley's prior controlled substance convictions, Whitely was determined to be a career offender. Because of his three prior felony drug convictions, Whitley was also facing a mandatory life sentence. As a result, Whitley negotiated a Rule 11 plea agreement and agreed to a sentencing guideline range of 210 to 262 months. The court sentenced Whitley to 262 months' imprisonment.

Whitley began serving his current sentence on June 26, 2009. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Whitley does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although Whitley's heightened risk from Covid-19 based on his obesity and heart failure qualifies as "extraordinary and compelling reasons" for release under § 1B1.13(1)(A) & cmt. n.1(A), Whitley is not otherwise eligible for release. Whitley's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Whitley, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of

September 30, 2020, this process has already resulted in at least 7,686 inmates being placed on home confinement. *See* BOP Covid-19 Website. At least 120 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845— the Court should deny Whitley's motion for compassionate release.

## Background

Whitley is currently serving a sentence for possession with intent to distribute cocaine. Following a traffic stop on Whitley's vehicle, police found over 240 grams of cocaine hidden inside the tail light cavity.  Whitley was on probation at the time for another drug trafficking offense. Moreover, due to Whitley's prior convictions for controlled substance offenses, Whitely was determined to be a career offender. These convictions include:

(1) possession with intent to distribute cocaine < 50 grams (PSR, ¶ 37); and

(2) possession with intent to distribute cocaine < 50 grams (PSR, ¶40).

Because of a third felony drug conviction not listed above, Whitley was also facing a mandatory life sentence.  As a result, Whitley negotiated a Rule 11 plea agreement and agreed to a guideline range of 210 to 262 months. Whitley agreed that this range was warranted based upon the nature and extent of his criminal history, which in

addition to the drug offenses, also included two crimes of violence.  ECF NO. 45, Pg. 4 of 15; (PSR, ¶¶ 29, 33).

Whitley began serving his prison sentence on June 26, 2009, and is currently incarcerated at FCI Elkton. He is 49 years old, and his projected release date is November 21, 2028. His only underlying medical conditions are obesity and congestive heart failure in 2007. Nevertheless, Whitley has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Whitley has exhausted his administrative remedies.

**Argument**

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

    A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website.

Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

5

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B.    FCI Elkton has significantly improved its response to Covid-19.

It is true that FCI Elkton experienced a significant outbreak of Covid-19 during which nine inmates died and which resulted in extensive litigation.  But the situation there has improved significantly. BOP officials implemented a six-phase plan to combat the outbreak at FCI Elkton, which included "screening for symptoms, educating staff and inmates, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks." *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020).  The district court in the *Wilson* case now receives near-daily status reports detailing test results in FCI Elkton and has ordered the warden to provide updates on steps being taken to segregate inmates and otherwise mitigate the outbreak. These status reports are encouraging, with fewer than six positive tests reported among inmates since July 27, 2020. *United States  v. Shawn Kelly Thomason*, No. 19-CR-05 (ECT/SER), 2020 WL 4915833, at *2 (D. Minn. Aug. 21, 2020).  As of September 30, 2020, there are

only four confirmed active cases of Covid-19 in FCI Elkton; two inmates and two staff.[1]

### C.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,686 federal inmates have been granted home confinement since the Covid-19 pandemic

---

[1] https://www.bop.gov/coronavirus/

began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail

or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other

9

resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Whitley's motion for compassionate release.

Whitley's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been

imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Whitley is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Despite Whitley having exhausted his administrative remedies, compassionate release would be improper. Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18

U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other

reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Whitley and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Whitley's medical records, however, establish that he has medical conditions, which the CDC has confirmed are risk factors that place a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with those medical conditions, Whitley has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

But Whitley also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in

18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's

verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders, like Whitely. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect. *See Stone*, 608 F.3d at 948 n.7.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. Drug overdoses are skyrocketing. There

are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Whitley's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Whitley's history clearly demonstrates he is a danger:

i.    Whitley feloniously assaulted another person. (PSR, ¶ 54);

ii.   Whitley assaulted someone intending to cause great bodily harm. (PSR, ¶ 29);

ii.   Whitley attempted to kill another person. (PSR, ¶ 33);

iii.  Whitley has three drug trafficking convictions. (PSR, ¶¶ 4, 37, 40); and

iv.   Whitley's most recent drug trafficking conviction involved the possession of a firearm. (PSR, ¶ 20).

Most troubling about Whitley's past is his history of assaulting others. Despite the age of these convictions, their seriousness cannot be overstated. The most serious of these offenses occurred at the age of 25 when Whitley tried to kill another person. Whitley was convicted under Michigan law of assault with intent to murder. The elements of assault with intent to murder are "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v. Davis*, 216 Mich.App. 47, 53 (1996) (quotation marks and citation omitted). Whitley was originally charged in that case with (1) assault with intent to murder, (2) assault with a dangerous weapon, (3) assault with a dangerous weapon, and (4)

discharge of a firearm in or at a building. **Exhibit 1**. Although the underlying facts of this offense are not available (*see* PSR, ¶ 35), Whitley's conviction establishes that he assaulted another person, mostly likely with a gun, with the intent to kill that person, and that had he been successful, the killing would have amounted to murder. Arguably, no other offense, but murder itself, is as violent and dangerous as this offense.

In addition to Whitley's history of assaultive conduct, his history of drug dealing, which poses a danger itself, appears to have been an ongoing and unabashed endeavor. *Stone*, *supra* at 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."). While on parole for his first drug trafficking conviction, Whitley was again convicted of a drug trafficking offense. (PSR, ¶¶ 37-40). While on probation for this second drug trafficking offense, police made a controlled purchase of crack cocaine from Whitley, searched his residence, and found him in possession of crack cocaine. (PSR, ¶ 43-46). While on this same term of probation, police searched a residence associated with Whitley. Inside the residence they seized a large quantity of cocaine base, two firearms, and paperwork in the name of Whitley. Whitley was arrested a short distance away from the home and found in possession of nearly two thousand dollars in cash. (PSR, ¶¶ 8-11). Undeterred, Whitley was arrested again just a month later transporting a large quantity of cocaine in his vehicle. (instant offense; PSR, ¶¶

12-13). Whitley's continued drug trafficking, even after being arrested for drug offenses, and even while on supervision for past drug offenses, evidences his complete inability to conform his behavior.

Whitley is not eligible for compassionate release.

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Whitley eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstances of the offense, as well as Whitley's history and characteristics, do not warrant compassionate release. 18 U.S.C. § 3553(a)(1). As set forth above, Whitley was caught transporting over a quarter of a kilogram of cocaine just one month after being arrested following the execution of a search warrant where police seized two firearms and quantities of crack cocaine. Based upon Whitley's history of violence and drug dealing, Whitley was determined to be a career offender. Moreover, Whitley himself agreed, based upon the extent and nature of his criminal history, that an upward departure in his sentencing guideline range was warranted. ECF No. 45, Pg. 4 of 15.  Whitley's sentence also reflected the seriousness of the offense, promoted respect for the law, provided just punishment, and protected the public from further crimes by Whitely. 18 U.S.C. § 3553(a)(2)(A) and (C).

The § 3553(a) factors do not support release.

### C.   Subsequent changes in the law have no effect on Whitley's sentencing guideline range.

Whitely argues that his sentence is excessive due to subsequent changes in the law. Whitley contends that changes in the law, combined with his rehabilitation, warrant compassionate release. Whitley points to the Fair Sentencing Act and the First Step Act. In December 2018, Congress passed and the President signed the First Step Act of 2018, *see* First Step Act of 2018, P.L. 115-391. Section 404 of the

First Step Act permits a district court, in its discretion, to impose a reduced sentence for a defendant sentenced for a crack cocaine offense before August 3, 2010, if the mandatory minimum sentence for that offense was modified by section 2 or 3 of the Fair Sentencing Act of 2010. *Id.* at § 404(b) and (c).

These changes, however, are not applicable to Whitley. Whitley was convicted of a cocaine offense, not crack cocaine, and his sentencing guidelines were calculated based upon his status as a career offender, not drug quantities. (PSR, ¶ 27). As this Court previously held, "[t]he defendant [was] identified as a Career Offender at the time of the sentencing and, as such, he is not eligible for a reduction of sentence." ECF No. 82, PageID.326.

The court imposed Whitley's sentence within a sentencing guideline range to which Whitley agreed. Whitley's sentence was not excessive.

### III.    If the Court were to grant Whitley's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Whitley's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

**Conclusion**

Whitley's motion should be denied.

Respectfully Submitted,

MATTHEW SCHNEIDER
United States Attorney

Dated:  October 2, 2020

s/ANTHONY P. VANCE
ANTHONY P. VANCE
Assistant United States Attorney
Chief – Branch Offices
600 Church Street
Flint, MI 48502
Phone: 810-766-5177
Fax: 810-766-5427
anthony.vance@usdoj.gov
P61148

CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

All Attorneys of Record

Dated: October 2, 2020

s/ Kristi Bashaw, Legal Assistant
United States Attorney's Office